**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| SEEMA MADHAVAN, on behalf of herself and all others similarly situated, | Case No. |
| Plaintiff, | |
| v. | |
| BLISTEX INC., | **JURY TRIAL DEMANDED** |
| Defendant. | |

**CLASS ACTION COMPLAINT**

Plaintiff Seema Madhavan ("Plaintiff") brings this action on behalf of herself and all others similarly situated against Defendant Blistex Inc. ("Blistex" or "Defendant") for the manufacture, marketing, and sale of Odor-Eaters Spray Powder and Odor-Eaters Stink Stoppers Spray (the "Products") that are contaminated with the carcinogenic impurity benzene. Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to the allegations specifically pertaining to Plaintiff herself, which are based on personal knowledge.

**FACTS COMMON TO ALL CLAIMS**

1.      This is a class action lawsuit against Defendant for the manufacture and sale of the Products, which were defective because they contain benzene, a carcinogenic chemical impurity that has been linked to leukemia and other cancers. The Products are not designed to contain benzene (nor is the presence of benzene disclosed in any way on the Products' labels), and in fact no amount of benzene is acceptable in the Products. The presence of benzene in the Products renders them unsafe and worthless, and unsuitable for their principal and intended purpose.

1

2.      The Products are anti-fungal and foot odor reducing drug products regulated by the United States Food & Drug Administration ("FDA") pursuant to the federal Food, Drug and Cosmetics Act ("FDCA").  The presence of benzene in the Products renders them adulterated and misbranded.  As a result, the Products are illegal to sell under federal law and therefore are worthless.  *See* 21 U.S.C. §§ 331(a), 352.

3.      Benzene is a component of crude oil, gasoline, and cigarette smoke, and is one of the elementary petrochemicals.  The Department of Health and Human Services has determined that benzene causes cancer in humans.  Likewise, the FDA lists benzene as a "Class 1 solvent" that "should not be employed in the manufacture of drug substances, excipients, and drug products because of [its] unacceptable toxicity."  The World Health Organization ("WHO") and the International Agency for Research on Cancer ("IARC") have classified benzene as a Group 1 compound, defining it as "carcinogenic to humans."[1] In 2011, the United States Environmental Protection Agency introduced regulations that lowered limits on benzene in gasoline due to its carcinogenic nature.[2] California's Proposition 65 Fact Sheet for benzene states, "[b]enzene is on the Proposition 65 list because it can cause cancer and birth defects or other reproductive harm. Exposure to benzene can cause leukemia. Exposure to benzene during pregnancy may affect development of the child. It may also harm the male reproductive system."[3]

4.      According to the American Cancer Society:

IARC classifies benzene as "carcinogenic to humans," based on sufficient evidence that benzene causes acute myeloid leukemia (AML). IARC also notes that benzene exposure has been linked

---

[1] https://monographs.iarc.who.int/list-of-classifications

[2] https://www.epa.gov/gasoline-standards/gasoline-mobile-source-air-toxics

[3] https://www.p65warnings.ca.gov/fact-sheets/benzene

with acute lymphocytic leukemia (ALL), chronic lymphocytic leukemia (CLL), multiple myeloma, and non-Hodgkin lymphoma.[4]

5.     According to the National Institute for Occupational Safety and Health, humans can become exposed to benzene through "inhalation, skin absorption, ingestion, skin and/or eye contact." [5]

6.     On November 17, 2021, Defendant, in conjunction with the FDA, announced a recall of "forty-one lots of two Odor-Eaters® spray products to the consumer level due to the presence of benzene."[6]  The recall notice stated: "Benzene is classified as a human carcinogen. Exposure to benzene can occur by inhalation, orally, and through the skin and it can result in cancers including leukemia and blood cancer of the bone marrow and blood disorders which can be life-threatening."[7]  The recall instructed: "Consumers, distributors, and retailers that have product which is being recalled should stop using or selling these specific Odor-Eaters® spray products and dispose of them appropriately."[8]

7.     As OTC drug products regulated by the FDA, the Products must be both safe and effective and are subject to federal current Good Manufacturing Practices ("cGMP") regulations and the FDCA's state-law analogues.  These cGMP regulations require OTC medications like the Products to meet safety, quality, purity, identity, and strength standards.  *See* 21 U.S.C. § 51(a)(2)(B).  Federal and state regulatory regimes require that labeling for OTC products identify

---

[4] American Cancer Society. Benzene and Cancer Risk (January 5, 2016) (https://www.cancer.org/cancer/cancer-causes/benzene.html)

[5] National Institute for Occupational Safety and Health (NIOSH), Benzene, https://www.cdc.gov/niosh/npg/npgd0049.html.

[6] https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/odor-eatersr-issues-voluntary-nationwide-recall-specific-lots-odor-eatersr-spray-powder-and-odor (last visited 1/27/22).

[7] *Id.*

[8] *Id.*

each active and inactive ingredient.  21 C.F.R. 201.66 establishes labeling requirements for OTC

products and defines an inactive ingredient as "any component other than an active ingredient."

An "active ingredient" is "any component that is intended to furnish pharmacological activity or

other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease, or to

affect the structure or any function of the body of humans. The term includes those components

that may undergo chemical change in the manufacture of the drug product and be present in the

drug product in a modified form intended to furnish the specified activity or effect."

8.     21 C.F.R. § 210.1(a) states that the cGMPs establish "minimum current good

manufacturing practice for methods to be used in, and the facilities or controls to be used for, the

manufacture, processing, packing, or holding of a drug to assure that such drug meets the

requirements of the act as to safety, and has the identity and strength and meets the quality and

purity characteristics that it purports or is represented to possess."  In other words, entities at all

phases of the design, manufacture, and distribution chain are bound by these requirements.

9.     The FDA's cGMP regulations are found in 21 C.F.R. Parts 210 and 211. These

detailed regulations set forth minimum standards regarding: organization and personnel (Subpart

B); buildings and facilities (Subpart C); equipment (Subpart D); control of components and drug

product containers and closures (Subpart E); production and process controls (Subpart F);

packaging and label controls (Subpart G); holding and distribution (Subpart H); laboratory

controls (Subpart I); records and reports (Subpart J); and returned and salvaged drug products

(Subpart K). The FDA has worldwide jurisdiction to enforce these regulations if the facility is

making drugs intended to be distributed in the United States.

10.     Any drug product not manufactured in accordance with cGMPs is deemed "adulterated" or "misbranded" and may not be distributed or sold in the United States.  *See* 21 U.S.C. §§ 331(a), 351(a)(2)(B).

11.     FDA regulations require a drug product manufacturer to have "written procedures for production and process control designed to assure that the drug products have the identity, strength, quality, and purity they purport or are represented to possess."  21 C.F.R. § 211.100.

12.     Defendant disregarded the cGMPs outlined above.  If Defendant had not routinely disregarded the FDA's cGMPs, or had fulfilled its quality assurance obligations, Defendant would have identified the presence of the benzene contaminant almost immediately.

13.     Further, had Defendant adequately tested the Products for benzene and other carcinogens, reproductive toxins, and impurities, it would have discovered that the Products contained benzene at levels far above the legal limit, making those products ineligible for distribution, marketing, and sale.

14.     Defendant introduced contaminated, adulterated, and/or misbranded antifungal medications containing dangerous amounts of benzene into the U.S. market.

15.     Pursuant to 21 U.S.C. § 331(a) of the Food, Drug, and Cosmetics Act, the "introduction or delivery for introduction into interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded" is categorically prohibited.

16.     Notably, Plaintiff does not bring claims under the FDCA and does not seek to enforce federal law in this lawsuit.  Instead, Plaintiff brings state law causes of action that arise regardless of the Products' classification under the FDCA.  That the Products are in fact adulterated and misbranded simply underscores the unmerchantable nature of the Products.

5

17.     On the labeling of the Odor-Eaters Spray Powder Product, Defendant represents that the Product is "Tolnaftate Antifungal":



18.     Similarly, the Products label identifies "Tolnaftate" as the only active ingredient in the Product:



19.     Benzene is not listed as an active (or inactive) ingredient. Similarly, benzene is not listed as an ingredient on the Odor-Eaters Stink Stoppers Spray.

20.     As such, Defendant breached an express warranty that the only ingredients contained in the Products were those listed on the Products' label. Defendant also materially omitted facts regarding the Products, specifically that they contained benzene.

21.     Plaintiff and the Class were injured by the full purchase price of the Products because the Products are worthless, as they are adulterated and contain harmful levels of benzene. *See Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076, 1085 (11th Cir. 2019); *see also In re Valsartan, Losartan, & Irbesartan Prod. Liab. Litig.*, 2021 WL 222776, at *16 (D.N.J.

Jan. 22, 2021) ("This Court finds that contaminated drugs are economically worthless at the point of sale by virtue of the dangerousness caused by their contamination, regardless whether the sold VCDs actually achieved the medical purpose of lowering blood pressure. Put differently, contaminated drugs, even if medically efficacious for their purpose, cannot create a benefit of the bargain because the contaminants, and their dangerous effects, were never bargained for."). Plaintiff and class members bargained for an antifungal product free of contaminants and dangerous substances, and were deprived the basis of their bargain when Defendant sold them products containing the dangerous substance benzene, which rendered the Products unmerchantable and unfit for use.

22. Despite selling Products contaminated with elevated levels of benzene, Defendant has not offered a refund to purchasers of the Products.

23. Plaintiff brings this action on behalf of herself and the Class for equitable relief and to recover damages and restitution for: (i) breach of express warranty; (ii) breach of implied warranty; (iii) unjust enrichment; (iv) violation of New York General Business Law ("GBL") § 349; (v) violation of GBL § 350; and (vi) violation of the Magnuson-Moss Warranty Act.

## PARTIES

24. Plaintiff Seema Madhavan is a resident of New York, New York and has an intent to remain there, and is therefore a domiciliary of New York.  On or around December 25, 2020, Ms. Madhavan purchased Defendant's Odor-Eaters Stink Stoppers Spray online through Amazon.com.  The Product Plaintiff purchased bore Lot Number D20C01 and expiration date March 2022.  This Product is one of the recalled Products as indicated by the FDA recall announcement.  Therefore, Ms. Madhavan purchased a Product contaminated with dangerously high levels of benzene.  When purchasing the Product, Ms. Madhavan reviewed the

accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the Product contained only the active ingredients stated on the label. Ms. Madhavan further reasonably believed that the Product was properly manufactured, free from defects, safe for its intended use, not adulterated or misbranded, and legal to sell. Ms. Madhavan relied on these representations and warranties in deciding to purchase the Product manufactured by Defendant, and these representations and warranties were part of the basis of the bargain, in that she would not have purchased the Product from Defendant if she had known that it was not, in fact, properly manufactured, free from defects, safe for its intended use, adulterated and misbranded, and legal to sell. The Product Plaintiff purchased was contaminated with benzene, therefore rendering it improperly manufactured, defective, not safe for its intended use, adulterated and misbranded, and illegal to sell.

25. On November 18, 2021, Plaintiff received an email notification from Amazon stating that "[w]e have recently learned of a potential safety issue regarding the following product that our records indicate you purchased from Amazon: Odor-Eaters Foot Spray Powder 4 Oz (Packaging May Vary). Odor-Eaters has informed us that the products Spray Powder and Stink Stoppers Spray may contain potential presence of Benzene." After receiving this email, Plaintiff stopped using the Product and did not get the benefit of the full amount of Product in the bottle.

26. Defendant Blistex Inc. is a corporation organized under the laws of the State of Illinois and maintains its principal place of business at 1800 Swift Dr, Oak Brook, IL 60523. Defendant sold the contaminated Products directly and through retailers in the state of New York and nationwide.

## JURISDICTION AND VENUE

27.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one

member of the Class, as defined below, is a citizen of a different state than Defendant, there are

more than 100 members of the Class, and the aggregate amount in controversy exceeds

$5,000,000 exclusive of interest and costs.

28.     This Court has personal jurisdiction over Defendant because Defendant is

incorporated and maintains its principal place of business in this District, and is therefore subject

to general personal jurisdiction in this District.

29.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because it is the

District in which Defendant resides.

## CLASS ACTION ALLEGATIONS

30.     Plaintiffs bring this action individually and as representatives of all those

similarly situated pursuant to Federal Rule of Civil Procedure 23 on behalf of the below-defined

Classes:

> **National Class:** All persons in the United States that purchased the
> Products (the "Class").

> **New York Subclass:**  All persons in the state of New York that purchased
> the Products (the "New York Subclass").

31.     The Class and New York Subclass are collectively referred to as the "Classes."

32.     Subject to additional information obtained through further investigation and

discovery, the foregoing definitions of the Classes may be expanded or narrowed by amendment

to the complaint or narrowed at class certification.

33.     Specifically excluded from the Classes are Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or Defendant's officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

34.     **Numerosity.**  The members of the proposed Classes are geographically dispersed throughout the United States and are so numerous that individual joinder is impracticable.  Upon information and belief, Plaintiff reasonably estimates that there are hundreds of thousands of individuals that are members of the proposed Classes. Although the precise number of proposed members are unknown to Plaintiff, the true number of members of the Classes are known by Defendant.  Members of the Classes may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

35.     **Typicality.**  The claims of the representative Plaintiff are typical of the claims of the Classes in that the representative Plaintiff, like all members of the Classes, purchased the Products, which were worthless due to the presence of benzene, a harmful and carcinogenic chemical impurity.  The representative Plaintiff has been damaged by Defendant's misconduct in the very same way as the members of the Classes.  Further, the factual bases of Defendant's misconduct are common to all members of the Classes and represent a common thread of misconduct resulting in injury to all members of the Classes.

36.     **Existence and predominance of common questions of law and fact.**  Common questions of law and fact exist as to all members of the Classes and predominate over any

questions affecting only individual members of the Classes. These common legal and factual questions include, but are not limited to, the following:

      (a)    whether the Products manufactured by Defendant contain dangerously high levels of benzene;

      (b)    whether Defendant breached express warranties contained on the labeling of the Products;

      (c)    whether Defendant is liable to Plaintiff and the Classes for unjust enrichment;

      (d)    whether the Products were unmerchantable and unfit for their intended use;

      (e)    whether Plaintiff and the Classes have sustained monetary loss and the proper measure of that loss;

      (f)    whether Plaintiff and the Classes are entitled to restitution and disgorgement from Defendant; and

      (g)    whether the marketing, advertising, packaging, labeling, and other promotional materials for the Products are deceptive.

37.     **Adequacy of Representation.** Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff has retained counsel who are highly experienced in complex consumer class action litigation, and Plaintiff intends to vigorously prosecute this action on behalf of the Classes. Plaintiff has no interests that are antagonistic to those of the Classes.

38.     **Superiority.** A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by members of the Classes are relatively small compared to the burden and expense of individual

litigation of their claims against Defendant. It would, thus, be virtually impossible for members of the Classes, on an individual basis, to obtain effective redress for the wrongs committed against them. Furthermore, even if members of the Classes could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

39.    In the alternative, the Classes may be certified because:

    (a)    the prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudication with respect to individual members of the Classes that would establish incompatible standards of conduct for the Defendant;

    (b)    the prosecution of separate actions by individual members of the Classes would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other members of the Classes not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

    (c)    Defendant has acted or refused to act on grounds generally applicable to the Classes as a whole, thereby making appropriate

final declaratory and/or injunctive relief with respect to the members

of the Class as a whole.

## CAUSES OF ACTION

### COUNT I
**Breach of Express Warranty**
**(On Behalf Of Plaintiff And The Nationwide Class And New York Subclass)**

40.     Plaintiff incorporates by reference and re-alleges herein all paragraphs alleged

above.

41.     Plaintiff brings this claim individually and on behalf of the members of the

proposed Class and the New York Subclass against Defendant.

42.     Plaintiff, and each member of the Class and the New York Subclass, formed a

contract with Defendant at the time Plaintiff and the other Class and New York Subclass

members purchased the defective Products.  The terms of the contract include the promises and

affirmations of fact made by Defendant on the Product's packaging and through marketing and

advertising, including that the Product would contain only the active ingredient stated on the

label, and not harmful impurities such as benzene.

43.     This labeling, marketing, and advertising constitute express warranties and

became part of the basis of the bargain, and are part of the standardized contract between

Plaintiff and the members of the Class and the New York Subclass and Defendant.

44.     Plaintiff relied on the express warranty that the Product would contain only the

active ingredient stated on the label, and not harmful impurities such as benzene.  These express

warranties further formed the basis of the bargain, and is part of the standardized contract

between Plaintiff and the members of the Class and the New York Subclass and Defendant.

45.     Defendant purports, through its advertising, labeling, marketing and packaging, to create an express warranty that the Product would contain only the active ingredient stated on the label, and not harmful impurities such as benzene.

46.     Plaintiff and the Class and the New York Subclass performed all conditions precedent to Defendant's liability under this contract when they purchased the defective Products.

47.     Defendant breached express warranties about the defective Products and its qualities because Defendant's statements about the Products were false because the defective Products Plaintiff and members of the Class and New York Subclass purchased do not conform to Defendant's affirmations and promises described above.

48.     Plaintiff and each of the members of the Class and the New York Subclass would not have purchased the defective Products on the same terms had they known the true nature of the defective Products' composition, specifically that the Products contained elevated levels of benzene.

49.     As a result of Defendant's breach of express warranty, Plaintiff and each of the members of the Class and the New York Subclass have been damaged in the amount of the purchase price of the Products, or at minimum the difference between the value of the Products as promised and warranted versus the value of the Products actually received, and any consequential damages resulting from the purchases.

50.     On March 8, 2022, prior to filing this action, Plaintiff served Defendant with a pre-suit notice letter that complied in all respects with U.C.C. §§ 2-313, 2-607.  A true and correct copy of the letter is attached hereto as **Exhibit A**.

**COUNT II**
**Breach of Implied Warranty**
**(On Behalf Of Plaintiff And The Nationwide Class And New York Subclass)**

51.     Plaintiff incorporates by reference and re-alleges herein all paragraphs alleged above.

52.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class and the New York Subclass against Defendant.

53.     Defendant, as the designer, manufacturer, marketer, distributor, and/or seller, impliedly warranted that the Products (i) would not contain elevated levels of benzene above acceptable daily intake limits, (ii) are generally recognized as safe for human consumption, and (iii) were not adulterated or misbranded such that the Products were lawful to sell in the United States and in the State of New York.  By selling the defective Products to Plaintiff and Class members and members of the New York Subclass, Defendant breached each of these implied warranties.

54.     Defendant breached the warranty implied in the contract for the sale of the defective Products because they could not pass without objection in the trade under the contract description, the Products were not of fair or average quality within the description, and the Products were unfit for their intended and ordinary purpose because the Products manufactured by Defendant were defective in that they contained elevated levels of carcinogenic benzene above the legal limit, and as such are not generally recognized as safe for human consumption. As a result, Plaintiff and Class and New York Subclass members did not receive the goods as impliedly warranted by Defendant to be merchantable.

16

55.     Plaintiff, Class, and New York Subclass members purchased the Products in reliance upon Defendant's skill and judgment and the implied warranties of fitness for the purpose.

56.     The Products purchased by Plaintiff and members of the Class and the New York Subclass were not altered by Plaintiff or Class or New York Subclass members.

57.     The Products were defective when they left the exclusive control of Defendant.

58.     Defendant knew that the Products would be purchased and used without additional testing by Plaintiff and the Class and the New York Subclass members.

59.     The Products that Plaintiff, the Class, and the New York Subclass purchased were defectively manufactured and unfit for their intended purpose because they contained elevated levels of benzene above the legal limit, and Plaintiff and Class and New York Subclass members did not receive the goods as warranted.  The Product was also adulterated and misbranded, and as such was unfit for use as a prescription medication because adulterated and misbranded medications are illegal to sell.

60.     As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiff and Class and New York Subclass members have been injured and harmed because: (a) they would not have purchased the Products on the same terms if they knew that the Products contained harmful levels of benzene, and are not generally recognized as safe for human consumption; and (b) the Products do not have the characteristics, ingredients, uses, or benefits as promised by Defendant.

61.     On March 8, 2022, prior to filing this action, Plaintiff served Defendant with a pre-suit notice letter that complied in all respects with U.C.C. §§ 2-313, 2-607.  A true and correct copy of the letter is attached hereto as **Exhibit A**.

17

**COUNT III**
**Unjust Enrichment**
**(On Behalf Of Plaintiff And The Nationwide Class And New York Subclass)**

62.     Plaintiff incorporates by reference and re-alleges herein all paragraphs alleged above.

63.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class and New York Subclass against Defendant.

64.     Plaintiff and Class members conferred benefits directly on Defendant by purchasing the Products, and Defendant unjustly and inequitably retained the benefits because it retained profits and the revenue from the sale of the Products even though the Products cannot be used for their principal intended purpose and are worthless due to the presence of benzene.

65.     Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff's and Class members' purchases of the Products. Retention of those moneys under these circumstances is unjust and inequitable because the Products were unfit for use as antifungal and odor-reducing agents. Plaintiff and Class members were damaged because they would not have purchased the Products if the true facts were known.

66.     Retention of those moneys also is unjust and inequitable because Defendant knows the Products are defective and has issued a recall, but has not provided a refund to Plaintiff or members of the Classes.

67.     Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiff and Class members is unjust and inequitable, Defendant must pay restitution and other relief to Plaintiff and Class members for its unjust enrichment, as ordered by the Court.

## COUNT IV
### Violation Of New York's General Business Law § 349
### (On Behalf Of Plaintiff And The New York Subclass)

68.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

69.     Plaintiff brings this claim individually and on behalf of the proposed New York Subclass against Defendant.

70.     New York's General Business Law § 349 prohibits deceptive acts or practices in the conduct of any business, trade, or commerce.

71.     In its sale of goods throughout the State of New York, Defendant conducts business and trade within the meaning and intendment of New York's General Business Law § 349.

72.     Plaintiff and members of the New York Subclass are consumers who purchased products from Defendant for their personal use.

73.     By the acts and conduct alleged herein, Defendant has engaged in deceptive, unfair, and misleading acts and practices, which include, without limitation, representing that the Products were antifungal odor-reducing Products that could be used for those purposes, by representing that the only active ingredient in the Products was "tolnaftate," and by failing to disclose the presence of benzene in the Products.

74.     The foregoing deceptive acts and practices were directed at consumers.

75.     The foregoing deceptive acts and practices are misleading in a material way because they fundamentally misrepresent the characteristics of the Products to induce consumers to purchase same.  Defendant's misrepresentations and omissions of fact were material because if Plaintiff and members of the New York Subclass were apprised of the true nature of the

Products, namely that the Products contained benzene and were unsafe and unfit for use, they would have been aware of that fact and would not have purchased the Products.

76.     By reason of this conduct, Defendant engaged in deceptive conduct in violation of New York's General Business Law.

77.     Defendant's actions are the direct, foreseeable, and proximate cause of the damages that Plaintiff and members of the New York Subclass have sustained from having paid for and consumed Defendant's products.

78.     As a result of Defendant's violations, Plaintiff and members of the Subclass have suffered damages because: (a) they would not have purchased the Products on the same terms if they knew that the Products contained benzene and are not generally recognized as safe; (b) they would not have purchased the Products or would not have purchased them on the same terms if they knew that the Products could not be used for their intended purpose; (c) they paid a price premium for the Products due to Defendant's misrepresentations and omission of the fact that the Products contained benzene and the misrepresentations that the Products contained only the active ingredient tolnaftate; and (d) the Products do not have the characteristics, ingredients, uses, benefits, or quantities as promised.

79.     On behalf of herself and other members of the New York Subclass, Plaintiff seeks to recover her actual damages or fifty dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

**COUNT V**
**Violation Of New York's General Business Law § 350**
**(On Behalf Of Plaintiff And The New York Subclass)**

80.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

81.     Plaintiff brings this claim individually and on behalf of the proposed New York
Subclass against Defendant.

82.     New York's General Business Law § 350 prohibits false advertising in the
conduct of any business, trade, or commerce.

83.     Pursuant to said statute, false advertising is defined as "advertising, including
labeling, of a commodity … if such advertising is misleading in a material respect."

84.     Based on the foregoing, Defendant has engaged in consumer-oriented conduct
that is deceptive or misleading in a material way which constitutes false advertising in violation
of Section 350 of New York's General Business Law.

85.     Defendant engaged in a material misrepresentation by representing that the
Products' only active ingredient was "tolnaftate" and that Products were fit for use as antifungal
and odor-reducing Products.  Defendant materially omitted the true facts regarding the Products,
namely that they contained benzene and were unsafe and unfit for their intended use.

86.     Defendant's false, misleading, and deceptive statements and representations of
fact and omissions were and are directed to consumers.

87.     Defendant's false, misleading, and deceptive statements and representations of
fact and omissions were and are likely to mislead a reasonable consumer acting reasonably under
the circumstances.

88.     Defendant's false, misleading, and deceptive statements and representations of
fact and omissions have resulted in consumer injury or harm to the public interest.

89.     As a result of Defendant's false, misleading, and deceptive statements and
representations of fact and omissions, Plaintiff and the Subclass have suffered economic injury

because the Products were worthless and Plaintiff and the New York Subclass paid a price premium for the Products in the amount of the full purchase price of the Products.

90.     As a result of Defendant's violations, Plaintiff and members of the New York Subclass have suffered damages because: (a) they would not have purchased the Products on the same terms if they knew that the Products contained benzene, and are not generally recognized as safe; (b) they would not have purchased the Products or would not have purchased them on the same terms if they knew that the Products could not be used as antifungal and odor-reducing medications; (c) they paid a price premium for the Products due to Defendant's omission of the fact that the Products contained benzene and the misrepresentation that the Products contained only tolnaftate as an active ingredient; and (d) the Products do not have the characteristics, ingredients, uses, benefits, or quantities as promised.

91.     On behalf of herself and other members of the New York Subclass, Plaintiff seeks to recover her actual damages or five hundred dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

## COUNT VI
### Violation Of The Magnuson-Moss Warranty Act,
### 15 U.S.C. §§ 2301, *et seq.*
### (On Behalf Of Plaintiff And The Nationwide Class)

92.     Plaintiff incorporates by reference and re-alleges herein all paragraphs alleged above.

93.     Plaintiff brings this claim individually and on behalf of the members of the proposed Classes against Defendant.

94.     The Product is a consumer product as defined in 15 U.S.C. § 2301(1).

95.     Plaintiff and Class members are consumers as defined in 15 U.S.C. § 2301(3).

96.     Defendant is a supplier and warrantor as defined in 15 U.S.C. § 2301(4) and (5).

97.     In connection with the marketing and sale of the Products, Defendant impliedly warranted that the Product was fit for its intended use and not contaminated with carcinogenic impurities such as benzene.  The Products were not fit for their intended use due to the defect described in the allegations above.

98.     By reason of Defendant's breach of warranties, Defendant violated the statutory rights due to Plaintiff and the Class and Subclass Members pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*, thereby damaging Plaintiff and the Class and Subclass Members.

99.     Plaintiff and the Class and Subclass Members were injured as a direct and proximate result of Defendant's breach because they would not have purchased the Product if they knew the truth about the defective nature of the Product.

100.    Pursuant to 15 U.S.C. § 2310(d)(1), Plaintiff and the Class are entitled to recover the damages caused to them by Defendants' breach of written and implied warranty, which either constitute the full purchase price of the Products or the difference in value between the Products as warranted and the Products as sold. In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiff and the Class are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have been reasonably incurred by Plaintiff and the Class in connection with the commencement and prosecution of this action.

101.    On March 8, 2022, prior to filing this action, Plaintiff served Defendant with a pre-suit notice letter that complied in all respects with the MMWA.  A true and correct copy of the letter is attached hereto as **Exhibit A**.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks

judgment against Defendant, as follows:

a.      For an order certifying the Class and the New York Subclass under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and New York Subclass and Plaintiff's attorneys as Class Counsel to represent the Class and New York Subclass members;

b.      For an order declaring the Defendant's conduct violates the statutes referenced herein;

c.      For an order finding in favor of Plaintiff, the nationwide Class, and the New York Subclass on all counts asserted herein;

d.      For compensatory and punitive damages in amounts to be determined by the Court and/or jury;

e.      For pre-judgment interest on all amounts awarded;

f.      For an order of restitution and all other forms of monetary relief;

g.      For an order awarding Plaintiff and the Class and Subclass their reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury of all issues so triable.

Dated: March 15, 2022          Respectfully submitted,

By: */s/ Carl V. Malmstrom*

Carl V. Malmstrom
**WOLF HALDENSTEIN ADLER**
 **FREEMAN & HERZ LLC**
111 West Jackson Blvd., Suite 1700
Chicago, IL 60604
Telephone: (312) 984-0000
Facsimile: (212) 686-0114

*Local Counsel for Plaintiff*

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (*pro hac vice* forthcoming)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: 925-300-4455
Facsimile: (212) 989-9163
E-Mail: ltfisher@bursor.com

**BURSOR & FISHER, P.A.**
Andrew J. Obergfell (*pro hac vice* forthcoming)
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail:  aobergfell@bursor.com

*Attorneys for Plaintiff*